# 25-1058

# United States Court of Appeals
### *for the*
# Fourth Circuit

MARGARET P. BYERS, Co-administrator of the Estate of
Charles M. Byers, Deceased; MICHAEL C. BYERS,
Co-administrator of the Estate of Charles M. Byers, Deceased,

*Plaintiffs/Appellees*,

— v. —

GORDON J. PAINTER,

*Defendant/Appellant,*

and

CITY OF RICHMOND; CHIPPENHAM & JOHNSTON-WILLIS
HOSPITALS, INC., a subsidiary of HCA Healthcare, Inc.;
STEVEN M. GIBSON; DAVID R. HYDE, JR.; JOHN/JANE DOE
SECURITY GUARDS (1-5); COUNTY OF CHESTERFIELD,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT RICHMOND

## OPENING BRIEF OF APPELLANT

Jeffrey L. Mincks
Julie A. C. Seyfarth
Andrew J. Fulwider
COUNTY ATTORNEY'S OFFICE
 FOR THE COUNTY OF CHESTERFIELD
Post Office Box 40
Chesterfield, Virginia 23832
(804) 748-1491

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>25-1058</u>     Caption: <u>Margaret P. Byers, et al. v. Gordon J. Painter, et al.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Gordon J. Painter</u>
(name of party/amicus)

_____

 who is _____<u>appellant</u>_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐ YES ☑ NO

2.     Does party/amicus have any parent corporations?     ☐ YES ☑ NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐ YES ☑ NO
       If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?     ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?     ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____ /s/ _____     Date: _____ January 31, 2025 _____

Counsel for: _____ Gordon J. Painter _____

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................... ii

JURISDICTIONAL STATEMENT ........................................................... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............. 1

STATEMENT OF THE CASE .................................................................. 2

    I.    Procedural History ................................................................ 2

    II.    Statement of Facts ............................................................... 3

SUMMARY OF THE ARGUMENT ....................................................... 13

STANDARD OF REVIEW ..................................................................... 15

ARGUMENT ........................................................................................... 17

    I.    Corporal Painter is Entitled to Qualified Immunity ........... 17

        A.    The district court erred by not applying the *Graham* factors and refusing to consider the totality of the circumstances confronting Corporal Painter during the incident ..................................................................... 20

        B.    Application of the *Graham* factors demonstrates that Corporal Painter's use of deadly force was objectively reasonable ................................................................... 21

            1.    The severity of the crimes was high .............. 22

            2.    The suspect posed an immediate threat to the safety of the officers, as well as to other individuals who were outside or inside their homes or vehicles ........................................... 24

            3.    The suspect was attempting to resist arrest and evade arrest by flight ..................................... 31

        C.    No Binding Precedent Has Held that the Use of Deadly Force in Sufficiently Similar Circumstances Constitutes an Unreasonable Use of Force ............... 33

CONCLUSION ........................................................................................ 42

Page(s)

Cases:

*Aleman v. City of Charlotte*,
   80 F.4th 264 (4th Cir. 2023)...................................................................... 26, 40

*Anderson v. Russell*,
   247 F.3d 125 (4th Cir. 2001)...................................................................... 21, 28

*Ashcroft v. al-Kidd*,
   563 U.S. 731 (2011).................................................................................... 18, 33

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...........................................................................................15

*Atkinson v. Godfrey*,
   100 F.4th 498 (4th Cir. 2024)...........................................................................15

*Behrens v. Pelletier*,
   516 U.S. 299 (1996)...........................................................................................19

*Betton v. Belue*,
   942 F.3d 184 (4th Cir. 2019)...................................................................... 40, 41

*Blanford v. Sacramento County*,
   406 F.3d 1116 .......................................................................... 23, 35, 36, 37

*Bogie v. Rosenberg*,
   705 F.3d 603 (7th Cir. 2013)............................................................................16

*Butters v. James Madison Univ.*,
   145 F. Supp. 3d 610 (W.D. Va. 2015) .............................................................16

*Caraway v. City of Pineville*,
   111 F.4th 369 (4th Cir. 2024) ................................................................. *passim*

*City of Escondido, Cal. v. Emmons*,
   586 U.S. 38 (2019)............................................................................................34

*City of Tahlequah v. Bond*,
   595 U.S. 9 (2021)..............................................................................................42

*Cooper v. Sheehan*,
   735 F.3d 153 (4th Cir. 2013)..................................................... 26, 27, 39, 40

*Davidson v. Com.*,
    167 Va. 451, 187 S.E. 437 (1936) .......................................................23

*Doriety v. Sletten*,
    109 F.4th 670 (4th Cir. 2024) ....................................................... 15, 16

*E.I. du Pont de Nemours & Co. v. Colon Indus., Inc.*,
    637 F.3d 435 (4th Cir. 2011) .............................................................17

*Evans v. Chalmers*,
    703 F.3d 636 (4th Cir. 2012) .............................................................15

*Franklin v. City of Charlotte*,
    64 F.4th 519 (4th Cir. 2023) .......................................... 29, 38, 39, 41

*Goines v. Valley Cmty. Servs. Bd.*,
    822 F.3d 159 (4th Cir. 2016) ..................................................... 15, 16, 17

*Graham v. Connor*,
    490 U.S. 386 (1989) ................................................................... *passim*

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982) ..........................................................................17

*Hensley v. Price*,
    876 F.3d 573 (4th Cir. 2017) ......................................................... 24, 40

*Kisela v. Hughes*,
    584 U.S. 100 (2018) ..................................................... 18-19, 34, 35, 36

*Knibbs v. Momphard*,
    30 F.4th 200 (4th Cir. 2022) ............................................................29

*Lawhon v. Edwards*,
    477 F. Supp. 3d 428 (E.D. Va. 2020),
    *aff'd sub nom. Lawhon v. Mayes*, No. 20-1906,
    2021 WL 5294931 (4th Cir. Nov. 15, 2021) .......................................16

*Mitchell v. Forsyth*,
    472 U.S. 511 (1985) ............................................................................1

*Mullenix v. Luna*,
    577 U.S. 7 (2015) ........................................................................ 33-34

*Mylan Labs., Inc. v. Matkari*,
    7 F.3d 1130 (4th Cir. 1993) ...............................................................15

*Pearson v. Callahan,*
    555 U.S. 223 (2009) ................................................................. 18, 19

*Porterfield v. Lott,*
    156 F.3d 563 (4th Cir. 1998) ........................................................18

*Rambert v. City of Greenville,*
    107 F.4th 388 (4th Cir. 2024) ............................................ *passim*

*Reichle v. Howards,*
    566 U.S. 658 (2012) ........................................................................34

*Saucier v. Katz,*
    533 U.S. 194 (2001) ............................................................ 17, 18, 32

*Scott v. Harris,*
    550 U.S. 372 (2007) ........................................................................16

*Shaw v. City of Selma,*
    884 F.3d 1093 (11th Cir. 2018) .............................................. 26, 27

*Sigman v. Town of Chapel Hill,*
    161 F.3d 782 (4th Cir. 1998) ............................................... *passim*

*Silverman v. Town of Blackstone, Va.,*
    843 F. Supp. 2d 628 (E.D. Va. 2012),
    *aff'd,* 475 F. App'x 851 (4th Cir. 2012) .............................................15

*Slattery v. Rizzo,*
    939 F.2d 213 (4th Cir. 1991) ................................................. 27, 28

*Stanton v. Elliott,*
    25 F.4th 227 (4th Cir. 2022) ......................................... 18, 21, 28

*Taylor v. Baltimore County,*
    2025 WL 385774 (D. Md. Feb. 3, 2025) ................................. 30, 38

*Tennessee v. Garner,*
    471 U.S. 1 (1985) ................................................................... 20, 32

*White v. Pauly,*
    580 U.S. 73 (2017) .........................................................................34

*Wilson v. Layne,*
    526 U.S. 603 (1999) ......................................................................33

Statutes & Other Authorities:

U.S. Const., Amend. IV ..................................................... *passim*

28 U.S.C. § 1291 ...........................................................................1

28 U.S.C. § 1331 ...........................................................................1

42 U.S.C. § 1983 ..................................................................... 1, 18

Fed. R. Civ. P. 10(c) ............................................................... 15, 16

Fed. R. Civ. P. 12(b)(6)..........................................................15, 19

Va. Code § 17.1-805(C) ..............................................................23

Va. Code §§ 18.2-90-18.2-93 .....................................................23

Va. Code §§ 18.2-90-18.2-96 .....................................................23

Va. Code § 18.2-92.......................................................................31

Va. Code § 18.2-137 .....................................................................23

Va. Code § 18.2-460......................................................................23

Va. Code § 19.2-81.......................................................................31

## JURISDICTIONAL STATEMENT

Count III of the Amended Complaint alleges a cause of action arising under 42 U.S.C. § 1983. Therefore, the district court had federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331. On January 13, 2025, the district court entered an order denying Appellant Corporal Painter's Motion to Dismiss based on his entitlement to qualified immunity to Count III of the Amended Complaint—a "final decision" for purposes of 28 U.S.C. § 1291. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Corporal Painter timely filed his notice of appeal. Accordingly, this Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Corporal Painter is entitled to qualified immunity because his use of deadly force was objectively reasonable based on the totality of the circumstances and, therefore, did not violate decedent's Fourth Amendment rights.

2. Corporal Painter is entitled to qualified immunity because it was not clearly established that it would be a violation of decedent's Fourth Amendment rights for Corporal Painter to use deadly force when confronting a breaking and entering suspect a) who was wielding a hatchet that he refused to drop, despite receiving more than fifteen commands to do so, and b) who momentarily raised the hatchet and then defiantly challenged the officers to "come get it" in the seconds before Corporal Painter fired his service weapon.

<u>STATEMENT OF THE CASE</u>

I.   <u>Procedural History.</u>

In response to Appellee's Amended Complaint, Corporal Painter filed a Motion to Dismiss Count III (Excessive Force - Fourth and Fourteenth Amendment) and Count V (Negligence, Gross Negligence, and Willful and Wanton Negligence). With respect to Count III, Corporal Painter argued that he is entitled to qualified immunity because his use of force was objectively reasonable and did not violate clearly established law. As to Count V, Corporal Painter argued that he is immune from state law claims of ordinary negligence and that the factual allegations pled in the Amended Complaint do not rise to the level of gross or willful and wanton negligence under Virginia law.

On January 13, 2025, the district court issued its Memorandum Opinion and Order granting in part and denying in part Corporal Painter's Motion to Dismiss. In denying the Motion to Dismiss the Fourth Amendment claim in Count III, the district court utilized a legally incorrect standard, holding that, "[i]nstead of the *Graham* factors," the court was constrained to look only at the precise moment that force was used and could not consider the totality of the circumstances facing a reasonable officer in that situation. JA145. Controlling case law mandates that excessive force claims, including deadly force cases, must be evaluated under the *Graham* factors and must consider the totality of the circumstances faced by the officer. By looking

solely at the instant force was used, the district court disregarded numerous undisputed facts about the encounter that are relevant to how an objectively reasonable officer could have perceived the threat posed to the officers and nearby civilians. Properly considered, the totality of the circumstances presented in the Amended Complaint and undisputed body-worn-camera ("BWC") videos demonstrate that it was objectively reasonable and not contrary to clearly established law for Corporal Painter to believe that a breaking and entering suspect wielding a hatchet in the middle of a busy residential neighborhood who refused to obey multiple, clear commands to drop the hatchet, and instead raised the hatchet and then challenged the officers, posed an immediate deadly threat to the officers and nearby neighbors. As a result of the Court's application of the wrong standard, Corporal Painter was erroneously denied qualified immunity.

The district court dismissed Appellees' state law claims for ordinary and gross negligence, but erroneously denied the Motion to Dismiss as to the cause of action for willful and wanton negligence. The court's decision that the willful and wanton negligence claim could survive was based on its determination that Appellees had stated a claim for a Fourth Amendment violation. JA152-153.

## II.    Statement of Facts.

The facts of this case are critical because they provide the information possessed by Corporal Painter when deciding to use force. The facts derive solely

from the allegations of Appellee's Amended Complaint, the BWC video from the two officers on the scene, and the audio from the police dispatch leading up to the incident. Appellee incorporated the BWC video of both officers into the Amended Complaint and attached it as Exhibit H. JA62 at ¶ 53; JA135; JA160. The audio from the police dispatch is heard throughout the BWC videos.

At approximately 12:50 p.m. on the afternoon of Saturday, July 8, 2023, a Chesterfield County Emergency Communications Center ("ECC") dispatcher notifies Unit 130 ("the Female Officer") of an emergency call for police.[1] JA157 at 00:00-00:03; JA61-62 at ¶ 52. The dispatcher radios to all officers on duty, including Corporal Painter, the following information: "B&E [breaking and entering] attempt 1224 Wycliff Ct. and 12." "Caller advised that there is a white male subject that just tried to enter her residence, he is now currently walking away towards Wycliff Rd. and Ct." JA157 at 00:00-00:20; JA61-62 at ¶ 52.

The ECC dispatcher provides an update to all officers on the radio, stating "B&E attempt Wycliff Ct. and 12, the caller is advising that a male subject, bald white male, last seen wearing black t-shirt, black shorts and barefoot came up and took off her back screen. He is now currently walking through the neighborhood." JA157 at 00:53-01:09; JA61-62 at ¶ 52. A male is heard on the radio traffic saying,

---

[1] The BWC videos establish that Unit 130 is the Female Officer who responded to the call for service with Corporal Painter and that K4 is Corporal Painter.

"If the dog is finished up there, can we get him started to Wycliff," and the ECC dispatcher responds, "K4 [Corporal Painter] is enroute to Wycliff." JA157 at 01:24-01:31.

The ECC dispatcher radios another update, this time about a second complainant: "Units responding to Wycliff, we have an additional caller, a neighbor, advising he lives at 1218 Wycliff Ct. and the subject just tried to open their front door and is now standing inside of someone else's garage." JA157 at 02:00-02:14; JA158 at 00:29-41[2]; JA61-62 at ¶ 52. The ECC dispatcher then provides the officers with an update regarding the suspect's location: "Units responding to Wycliff, the subject is going to be at a residence closer to the end of the street, the Court and the Road." JA157 at 02:31-00:39; JA158 at 03:36-03:44. As the Female Officer approaches the area she asks for another update on the suspect's location, and the ECC dispatcher responds, "130 at 12:59 caller advised he was going to be closer to the end of the street, Wycliff Rd. and Wycliff Ct, in somebody's garage." JA157 at 04:08-04:17; JA158 at 05:23-05:37.

The Female Officer arrives first in an SUV which has "Chesterfield County Police Department" clearly marked on the vehicle. JA158 at 005:40-05:51; JA159

---

[2] JA158 is the same BWC video file attached as Ex. H to the Amended Complaint, JA135; JA160, however it starts with the Female Officer's actual activation of the BWC.

at 01:30.[3]  The Female Officer's uniform also identifies her as POLICE.  JA158 at 05:40-05:51; JA159 at 01:30.

The Female Officer states on the radio "130, I am out with him at 9100 and he has a weapon in his hand."  JA157 at 04:24-04:27; JA158 at 05:44-05:47.  K4 updates his location on the radio: "I'm turning on to Atkins now" and dispatch responds "10-4, 130 is in the area."  JA157 at 03:14-03:24; JA158 at 04:28-04:39.  As the Female Officer steps out of her SUV, the white male suspect, who matches the description from the 911 callers, has exited the garage and is now standing in the driveway of 9100 Wycliff Rd.  JA158 at 05:45-5:49.

The BWC video shows that the suspect's attention is momentarily on the Female Officer as she exits her vehicle, draws her firearm, and begins giving commands.  Her first command orders the suspect to drop his weapon: "Hey, drop that now. Do it now!"  JA158 at 05:49-5:53; JA61-62 at ¶ 53.  While the Female Officer is giving the suspect commands to drop his hatchet, the suspect turns his attention to Corporal Painter, who arrives in his police SUV.  JA158 at 05:52-5:54.  Instead of dropping the weapon, the suspect raises the hatchet while looking at Corporal Painter as he steps out of his vehicle.  JA158 at 05:52-5:54.

---

[3]  JA159 is the same BWC video file attached as Ex. H to the Amended Complaint, JA135; JA160, however it starts with the beginning of Corporal Painter's BWC video.

The Female Officer again orders the suspect to "Drop it. Do it now!" JA158 at 05:53-5:55. The Female Officer's BWC video shows a house to her left, parked vehicles, and two houses on either side of the suspect, which both have garage doors that are all the way open. JA158 at 05:47-05:51, 06:13. Her BWC video also shows a neighbor outside in one of the yards, mowing the front and side lawn. JA158 at 05:54-06:00.

Corporal Painter exits his police vehicle wearing an exterior vest clearly marked "POLICE." JA159 at 00:29-00:31; JA158 at 05:50-06:07, 06:50-06:52. Corporal Painter immediately says to the suspect: "Come on buddy, put the axe down. Come on. Let's go." JA159 at 00:29-00:33. Likewise, as the Female Officer is walking towards the suspect and Corporal Painter, she again commands the suspect to "Drop it." JA158 at 05:58-05:59; JA159 at 00:32-24. With the hatchet still gripped tightly in his right hand and his left hand balled up in a fist, the suspect locks his eyes on Corporal Painter, who then draws his firearm. JA159 at 00:30-00:37.

The suspect initially walks into the grass and away from Corporal Painter, but then turns to his left and walks into the street, moving closer to Corporal Painter, who was standing in the street with his firearm drawn. JA158 at 05:58-06:07; JA159 at 00:35-36. Corporal Painter commands the suspect, "Put it down buddy." JA159 at 00:36.

The suspect takes his eyes off Corporal Painter and looks down at the hatchet in his right hand. JA159 at 00:37; JA158 at 06:02-06:03. The Female Officer again commands the suspect to "Drop it." JA158 at 06:04-06:05; JA159 at 00:38-39. The suspect does not drop the hatchet. Instead, the suspect turns his head for a second to look down the street behind him towards the intersection. Then he immediately returns his focus back to Corporal Painter. JA158 at 06:04-06:06; JA159 at 00:40. Corporal Painter once again commands the suspect to "Put it down . . . Come on." JA158 at 06:07; JA159 at 00:40-00:43.

 The Female Officer sees that Corporal Painter has his firearm drawn and says, "Hey, I'll take less lethal." JA158 at 06:08-06:10. The Female Officer re-holsters her firearm and draws her Taser and aims it at the suspect. JA158 at 06:08-06:14.

Instead of turning to walk down Wycliff Rd. with his back to the officers, the suspect pivots 90 degrees so that his body is directly squared up to Corporal Painter, with the suspect's back towards the intersection with Atkins Rd. JA159 at 00:41-00:43; JA158 at 06:06-06:09. The suspect then opens up his left hand, so it is no longer in a fist, raises it to his face, and then lowers it back to his side, returning it back to a fist. JA159 at 00:41-00:43; JA158 at 06:08-06:11.

At that point, Corporal Painter raises his firearm to the high ready position. JA159 at 00:41-00:44. The suspect then says to Corporal Painter, "You gotta a big ass handgun?" JA159 at 00:43-00:48. Corporal Painter replies "Huh?" JA159 at

00:47-00:48; JA158 at 06:10-06:11. The suspect looks back down at his hatchet, which is still tightly gripped in his right hand, and then looks directly at Corporal Painter and says, "You gotta big enough gun?" JA159 at 00:43-00:48; JA158 at 06:10-06:12. Corporal Painter responds, "Yeah, come on. Put it down." JA159 at 00:43-00:48; JA158 at 06:12-06:14. The suspect continues to hold the hatchet with his hand near the end of the handle and his arm rigid and slightly out to his side. JA159 at 00:43-01:05. The weapon is roughly parallel to the ground and is not hanging in a loose or relaxed position at his side. JA159 at 00:43-01:05.

With the suspect's focus still in the direction of Corporal Painter and his body squared up to the officers, the suspect slowly and methodically walks backwards down the side of Wycliff Rd. JA159 at 00:43-01:05; JA158 at 06:12-06:23. Although they cannot be seen in the BWC video until later, residents from the neighborhood are gathered and watching from a position behind Corporal Painter and the Female Officer. JA159 at 01:48-01:59.

Both officers give the male suspect additional clear, concise, and consistent commands to drop the hatchet:

"Put the hatchet down." JA158 at 06:15-06:16; JA159 at 00:49.

"Put it down." JA158 at 06:19-06:20; JA159 at 00:53-54.

"Put it down." JA158 at 06:20; JA159 at 00:54.

"Put it down." JA158 at 06:21-06:23; JA159 at 00:56.

The suspect does not drop the hatchet nor make any motion or statement indicating an intent to comply with the commands.

While giving these commands to the suspect, Corporal Painter also urges the Female Officer to "go ahead" with the Taser. JA158 at 06:17-06:18; JA159 at 00:52. Corporal Painter then calls in on his radio, "One at gun point, walking backwards toward Atkins." JA159 at 00:57-001:00; JA158 at 06:23-06:26. While Corporal Painter is updating the ECC dispatcher and officers on the radio, a white car is seen (and heard) driving down Atkins Rd., crossing Corporal Painter's line of fire. JA159 at 00:57-00:59; JA158 at 06:22-06:26. The suspect then looks for a second over his right shoulder in the direction of Atkins Rd. and the passing vehicle, and then turns back, once again looking directly at the officers. JA158 at 06:25; JA159 at 00:59.

Corporal Painter again says to the Female Officer, "Go ahead and tase him." JA159 at 01:00-01. The suspect remains squared up to the officers and still has the hatchet clenched in his right hand. JA159 at 01:00. The Female Officer once again orders the suspect to "Put it down now," while another vehicle drives past the homes on Atkins Rd. and crosses what would be the officers' line of fire. JA159 at 01:02-01:05; JA158 at 06:26-06:31. Corporal Painter again directs the Female Officer to deploy her Taser. JA159 at 01:03-01:04. At this point, it appears from the Female Officer's BWC video that only one car length separates the officers and the suspect. JA158 at 06:29-06:30.

The Female Officer deploys her Taser. JA158 at 06:30-06:33; JA159 at 01:04-01:06. One Taser probe hits the suspect in his right shoulder and the second probe appears to graze or just miss his lower extremity. JA158 at 06:30-06:33; JA159 at 01:04-01:06. The suspect leans a bit to his left and says an unintelligible word but shows no intent to comply, despite the Taser probe deployment and the brief contact that at least one of the probes made with his upper body. JA158 at 06:30-06:32; JA159 at 01:04-01:07. To the contrary, the suspect continues walking backwards down Wycliff Rd., still gripping the hatchet and still focused on the officers. JA158 at 06:31-06:37; JA159 at 01:06-01:11. At this point, the BWC videos show a house with cars parked in the driveway, an above-ground pool in a neighbor's yard to the right of the officers, and several of the nearby homes lining both sides of Atkins Rd. JA158 at 06:31-06:37; JA159 at 01:06-01:11.

Corporal Painter again gives the suspect the opportunity to drop the hatchet and commands him to "Put it, put it down. Come on." JA159 at 01:07-01:09; JA158 at 06:32-06:33. As Corporal Painter gives the command to "put it down," the suspect shuffles his feet and raises his right hand, bringing the hatchet blade up and forward above his waist with the blade facing Corporal Painter. JA158 at 06:32-06:33; JA159 at 01:07-01:08.



The suspect then slightly lowers the blade of the hatchet and remarks to the officers, "Come get it." JA159 at 01:08-01:09; JA158 at 06:34-06:35. Corporal Painter gives the suspect one more opportunity to comply and orders the suspect to "Put it down." JA159 at 01:11; JA158 at 06:36. Instead of complying, the suspect repeats, "Come get it." JA159 at 01:11-01:12; JA158 at 06:35-06:36. The suspect then turns his head to the right, looking over his right shoulder towards the intersection behind him and moving slightly to his right. JA159 at 01:12; JA158 at 06:36-06:37.

In this moment, Corporal Painter has the suspect lined up in the middle of Wycliff Rd., with no people, homes, or moving vehicles in his line of fire. JA159 at 01:11-01:13; JA158 at 06:37-06:38. Corporal Painter then discharges his firearm. JA159 at 01:12-01:13; JA158 at 06:37-06:39; JA62 at ¶ 53. As he fires his weapon five times, the suspect continues to walk backwards with the hatchet still in hand. JA159 at 01:12-01:13; JA158 at 06:38-06:39. The suspect then turns in a counter-clockwise direction and looks back at Corporal Painter while raising his right arm up and lifting the hatchet blade to shoulder height. JA159 at 01:13-01:15; JA158 at 06:39-06:40. Corporal Painter fires two more shots. JA159 at 01:14-01:15; JA158 at 06:39-06:40; JA61-62 at ¶ 53. In total, Corporal Painter discharges his weapon seven times in approximately three seconds. JA159 at 01:12-01:15.

The suspect runs for approximately five seconds towards the intersection with the hatchet still gripped in his right hand. JA159 at 01:13-01:18; JA158 at 06:39-06:44. The suspect finally drops the hatchet on the pavement not far from the intersection but continues to run for several more steps before falling to the ground. JA159 at 01:21; JA158 at 06:44. The officers place the suspect in handcuffs and immediately begin rendering first aid.

## SUMMARY OF THE ARGUMENT

From the moment the Female Officer and Corporal Painter arrived on scene until the moment the suspect finally dropped the hatchet on the ground, both officers

were in what any objectively reasonable law enforcement officer would consider a deadly force encounter. The lives of the Female Officer, Corporal Painter, and the the residents who had gathered nearby—and those driving by—were in immediate danger throughout the encounter. At any second, the suspect, who the officers had reason to believe had just committed multiple serious crimes, could have lunged at the officers with the hatchet, thrown the weapon at the officers, or taken off running towards the neighbors with the deadly weapon. Corporal Painter and the Female Officer remained in harm's way to serve as a protective barrier between the residents and the suspect, to give the suspect time to comply with their orders, and to attempt less-than-lethal force.

When analyzing Corporal Painter's entitlement to qualified immunity to Count III of the Amended Complaint, the district court applied the wrong standard by expressly ignoring the *Graham* factors and the totality of the circumstances faced by the officers. *See* JA145. Instead of considering all of the facts surrounding the incident and known to the officers, the district court looked solely at a snapshot of the incident—the instant Corporal Painter fired his weapon. Upon a proper consideration of everything that the officers knew and what led up to the moment Corporal Painter fired his weapon, his use of force was objectively reasonable. Further, no controlling caselaw exists that would have made it obvious to Corporal Painter that using deadly force in such circumstances was unlawful.

<u>STANDARD OF REVIEW</u>

This Court reviews *de novo* the district court's decision denying a motion to dismiss based on qualified immunity. *Atkinson v. Godfrey*, 100 F.4th 498, n.5 (4th Cir. 2024); *Evans v. Chalmers*, 703 F.3d 636, 646 (4th Cir. 2012); *Doriety v. Sletten*, 109 F.4th 670, 679-80 (4th Cir. 2024). A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint. In considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, a plaintiff's well-pled allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir. 1993). This principle applies only to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009).

In deciding a motion to dismiss, "the Court may consider the facts alleged on the face of the complaint, as well as 'matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint.'" *Silverman v. Town of Blackstone, Va.*, 843 F. Supp. 2d 628, 631 (E.D. Va. 2012), *aff'd,* 475 F. App'x 851 (4th Cir. 2012). *See also* Fed. R. Civ. P. 10(c); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-166 (4th Cir. 2016).

In this case, Appellees have expressly relied on Corporal Painter's and the Female Officer's BWC videos of the incident by attaching a clipped and redacted version of them as Exhibit H to the Amended Complaint.  *See* Fed. R. Civ. P. 10(c).  JA61-62 at ¶ 53.  Therefore, their BWC videos are a part of the pleading and are fairly before this Court for consideration.  Fed. R. Civ. P. 10(c); *Doriety*, 109 F.4th at 679-80; *Bogie v. Rosenberg*, 705 F.3d 603, 608 (7th Cir. 2013); *Butters v. James Madison Univ.*, 145 F. Supp. 3d 610, 617 (W.D. Va. 2015).  "[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached . . . , the exhibit prevails.  This is based on the presumption that the plaintiff, by basing his claim on the attached document, has adopted as true the contents of that document."  *Lawhon v. Edwards*, 477 F. Supp. 3d 428, 436 (E.D. Va. 2020), *aff'd sub nom. Lawhon v. Mayes*, No. 20-1906, 2021 WL 5294931 (4th Cir. Nov. 15, 2021) (internal citations and quotation marks omitted) (citing *Goines*, 822 F.3d at 166).

In addition, the ECC dispatch to the officers is heard on the Female Officer's BWC video and is also relied on by Appellees in the factual allegations of the Amended Complaint.  JA61-62 at ¶ 52; JA135; JA160.  Therefore, the audio of the ECC dispatch is also integral to the Amended Complaint.  *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007); *Doriety*, 109 F.4th at 679-80 (holding "that a district court can consider a video submitted at the motion to dismiss stage" when it is "integral to the complaint" and "clearly depicts a set of facts contrary to those alleged in the

16

complaint or blatantly contradicts" the plaintiff's allegations); *Goines*, 822 F.3d at 164-66; *E.I. du Pont de Nemours & Co. v. Colon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011).

The district court correctly considered the BWC video evidence, expressly relying on limited portions of the footage to consider whether a threat existed at the instant Corporal Painter fired his weapon. JA146 at n.5. However, the district court erroneously did not examine the numerous other facts established by the videos and ECC dispatch because the court wrongly believed it could not consider the facts, circumstances, and events that took place *before* the instant Corporal Painter fired his weapon. JA146.

## ARGUMENT

### I. Corporal Painter is Entitled to Qualified Immunity.

"Police officers are protected by qualified immunity when performing their duties within the scope of their employment insofar as their conduct does not breach 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 786 (4th Cir. 1998) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001), the United States Supreme Court set forth a two-pronged analysis for determining whether the defense of qualified immunity applies to a claim of a constitutional violation under § 1983. "Determining which prong of

the qualified immunity analysis to first review rests within the Court's discretion." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The first prong asks whether, "[t]aken in the light most favorable to the party asserting the injury," the facts alleged by that party "show the officer's conduct violated a constitutional right." *Id.* at 201. It is well established that "officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Porterfield v. Lott*, 156 F.3d 563, 567 (4th Cir. 1998). "Qualified immunity thus provides a safe-harbor from tort damages for police officers performing objectively reasonable actions in furtherance of their duties." *Id.* (internal quotations omitted). And it "protects all but the plainly incompetent or those who knowingly violate the law." *Rambert v. City of Greenville*, 107 F.4th 388, 398 (4th Cir. 2024). "The plaintiff bears the burden of proof on this question." *Id.* (citing *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022)).

The second prong considers "whether the right was clearly established." *Saucier*, 533 U.S. at 202. "A government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear such that every reasonable official would have understood that what he is doing violates that right." *Rambert*, 107 F.4th at 398 (internal quotation marks omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)); *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) ("Use of excessive force is an area of the law in

which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue."). The officer bears the burden of proof on this prong. *Rambert*, 107 F.4th at 398.

Significant to an analysis of qualified immunity is the recognition that it is an immunity from suit and not merely a defense to liability. The Supreme Court and this Court expect district courts to scrutinize and dismiss appropriate cases on qualified immunity grounds at the earliest possible point in the litigation. *Sigman*, 161 F.3d at 786. "Indeed, when a district court declines to give a qualified immunity defense a hard look at an early stage in the litigation, either pursuant to a Rule 12(b)(6) motion to dismiss or a summary judgment motion, it risks the forfeiture of some protections afforded by the defense because the immunity includes 'an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question.'" *Id*. (quoting *Behrens v. Pelletier*, 516 U.S. 299, 306 (1996)); *Pearson*, 555 U.S. 223, 231-232 ("The 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that 'insubstantial claims against government officials [will] be resolved prior to discovery.'"); *Rambert*, 107 F.4th at 397-98 (stating qualified immunity "is also intended to free officials from litigation concerns and disruptive discovery").

Corporal Painter is entitled to qualified immunity at the motion to dismiss

stage because the material facts are established by the Amended Complaint and its Exhibits and they are undisputed. These facts establish that Corporal Painter's use of deadly force (1) was objectively reasonable based on the totality of the circumstances and therefore did not violate the suspect's Fourth Amendment rights, and (2) did not violate a right that was clearly established.

A.   The district court erred by not applying the *Graham* factors and refusing to consider the totality of the circumstances confronting Corporal Painter during the incident.

Claims of excessive force are analyzed under the objective reasonableness standard of the Fourth Amendment as enunciated in *Graham v. Connor*, 490 U.S. 386 (1989), and *Tennessee v. Garner*, 471 U.S. 1 (1985). However, the district court expressly declined to do this analysis. JA145. Instead, the court focused exclusively on the precise moment that Corporal Painter used force without considering the totality of the "facts and circumstances confronting" Corporal Painter and the Female Officer. *Compare Rambert*, 107 F.4th at 400 (considering in deadly force case the "historical facts and their impact on what a reasonable officer . . . would have done" and applying the *Graham* factors) *with* JA145 ("Instead of the *Graham* factors . . . .").

The district court based its approach on this Court's admonition that in deadly force cases the inquiry into whether a reasonable officer would perceive a threat must "focus on the moment that deadly force was used, not the whole episode."

20

*Stanton*, 25 F.4th at 233.  However, that principle in no way does away with the *Graham* factors or a totality of the circumstances analysis and instead merely addresses the fact that "the justification for deadly force can fall away in seconds." *Id.*  The Fourth Circuit has consistently employed an analysis of the *Graham* factors when reviewing the use of deadly force under the Fourth Amendment, and the district court erred by not doing so here.[4]  *See, e.g.*, *Caraway*, 111 F.4th at 382; *Rambert*, 107 F.4th at 397; *Anderson v. Russell*, 247 F.3d 125, 129-32 (4th Cir. 2001); *Sigman*, 161 F.3d at 786-87.

B.  Application of the *Graham* factors demonstrates that Corporal Painter's use of deadly force was objectively reasonable.

Whether a particular use of force used was reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.  This includes considering "the

---

[4] Although the rule in the Fourth Circuit is clear on this issue, its application is the subject of a pending U.S. Supreme Court case, *Barnes v. Felix*, No. 23-1239.  That case focuses on the extent to which police officers' conduct—as opposed to the suspect's—can be considered prior to the use of force.  Regardless of the outcome in *Barnes*, there is no question that courts are required to address the totality of the circumstances confronting police officers prior to the use of force through the lens of the *Graham* factors.  This is what the district court expressly declined to do.  *See* JA145.

historical facts that bear on the objective reasonableness of [the officer's] conduct." *Rambert*, 107 F.4th at 399-400. The "'reasonableness of a particular use of force must be judged from the 'perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Rambert*, 107 F.4th at 397 (quoting *Graham*, 490 U.S. at 396). In addition, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (internal quotations omitted). "Th[e] suggestion that the officer[ ] might have responded differently is exactly the type of judicial second look that the case law prohibits." *Id.* at 401.

1. *The severity of the crimes was high.*

According to the information relayed by the ECC dispatcher to Corporal Painter and the Female Officer, the suspect had attempted to break and enter into two homes in the neighborhood, had vandalized one home, and had entered another homeowner's garage. This was not a mental health call and was not dispatched as one. An objectively reasonable officer approaching the scene of a "reported in-progress breaking-and-entering would have known that a potentially dangerous crime was in process with imminent threat of serious injury to people in and around the home." *Id.* at 399.

This reasonable belief was confirmed. When the suspect was first spotted by Corporal Painter and the Female Officer, the suspect had just emerged from the garage and was holding a hatchet, a weapon that can be deadly both at close range and at a distance. *See Davidson v. Com.,* 167 Va. 451, 457, 187 S.E. 437, 440 (1936) (describing a hatchet as a "a deadly weapon—one of the most deadly of all weapons . . . ."). The officers were not certain whether the suspect had just used the hatchet in any of the attempted breaking-and-enterings, but a reasonable officer could certainly consider that the hatchet may have been stolen from a home and used in the commission of the reported crimes. *See Rambert,* 107 F.4th at 400. Therefore, the crimes that were at issue when Corporal Painter and the Female Officer arrived included potential Class 2 felonies to Class 6 felonies for the breaking-and-enterings and a Class 6 felony to Class 3 misdemeanor for vandalism to property. *See* Va. Code §§ 18.2-90-18.2-96; 18.2-137; Va. Code § 17.1-805(C) (identifying "violent felony offenses" to include Va. Code §§ 18.2-90-18.2-93).

The crimes at issue became even more significant when the suspect failed to comply with the numerous commands to drop the weapon and challenged the officers. *See* Va. Code § 18.2-460 (obstruction of justice involving attempts to intimidate or impede a law-enforcement officer); *see also Blanford v. Sacramento County*, 406 F.3d 1110, 1116 (9th Cir. 2005) ("Blanford failed to communicate or comply with their orders to stop and drop the sword . . . . Instead he raised his sword

and growled. This was a crime, and in addition gave the deputies cause to believe that Blanford posed a threat of harm to whomever he encountered.").

The first *Graham* factor weighs decidedly in favor of Corporal Painter.

2. *The suspect posed an immediate threat to the safety of the officers, as well as to other individuals who were outside or inside their homes or vehicles.*

From the moment Corporal Painter and the Female Officer stepped out of their police vehicles and onto Wycliff Rd., they were confronted with a criminal suspect armed with a hatchet who refused to obey commands and acted in a threatening manner. An objectively reasonable officer on scene and faced with the same circumstances could (and would) consider the suspect an immediate threat to the safety of the police officers and others in the immediate area.

The suspect first raised the hatchet in a threatening manner as soon as Corporal Painter exited his vehicle. He then changed direction to move closer to Corporal Painter while switching his gaze from the hatchet to Corporal Painter. As the suspect began walking backwards down the street, squared off to the officers with his hatchet firmly in hand, he never complied with the officers' repeated, consistent commands and continued to pose a deadly threat to the officers and nearby citizens. *See Hensley v. Price*, 876 F.3d 573, 585 (4th Cir. 2017) ("If an officer directs a suspect to stop, to show his hands or the like, the suspect's continued movement likely will raise in the officer's mind objectively grave and serious suspicions about

the suspect's intentions . . . the officer can reasonably expect the worst at the split-second when he acts.").  At any point, the suspect could have lunged at the officers with the hatchet, thrown the hatchet (either overhand or underhand), or taken off running with the weapon towards the neighbors just behind Corporal Painter and the Female Officer, or towards one of the homes on Wycliff or Atkins Rd.  The officers had an obligation to protect the neighbors that were outside and nearby, the residents in their homes, and the occupants of the passing vehicles; they also had a right to protect themselves.

Even after the suspect was shot with a Taser and struck by at least one of the probes, the suspect continued to disregard the officers' commands.  In fact, shortly after the Taser deployment and just seconds before Corporal Painter fired, the suspect again raised the hatchet up in a threatening manner and shuffled his feet.  Although the suspect returned the blade of the hatchet to waist level, he kept his left hand in a fist, then twice challenged the officers to "come get it," and looked over his shoulder towards the intersection.  An objectively reasonable officer could consider those actions, the aggressive body language and verbal threats, to be pre-assault indicators.  Only then did Corporal Painter fire his weapon.

The district court erred by disregarding all of these facts and the circumstances, apparently believing that it could consider only a snapshot of the event—the precise instant Corporal Painter fired his service weapon.  Under the

correct standard, and in light of all of the circumstances which the officers knew at that point, a reasonable officer could perceive an immediate and serious threat to the safety of the officers and nearby neighbors. *See Shaw v. City of Selma*, 884 F.3d 1093, 1099 (11th Cir. 2018) ("Shaw could have raised the hatchet in another second or two and struck Williams with it. Whether the hatchet was at Shaw's side, behind his back, or above his head doesn't change that fact. Given those circumstances, a reasonable officer could have believed that Shaw posed a threat of serious physical injury or death at that moment. A reasonable officer could have also concluded . . . that the law did not require him to wait until the hatchet was being swung toward him before firing in self-defense.").

This Court has made clear that "an armed suspect need not engage in some specific action such as pointing, aiming, or firing his weapon to pose a threat[;] . . . there are many circumstances under which a police officer could reasonably feel threatened." *Cooper v. Sheehan*, 735 F.3d 153, 159 n.9 (4th Cir. 2013). Although officers may not use deadly force on an armed subject unless the individual makes "some sort of furtive or other threatening movement," that can occur in different forms and must be considered in light of all the factors confronting the officer. *Aleman v. City of Charlotte*, 80 F.4th 264, 286-87 (4th Cir. 2023); *see also Shaw*, 884 F.3d at 1099 ("The legal premise—that no reasonable officer could have feared serious injury or death unless the hatchet-holding hand was raised up at the time—

is wrong."). The final two times Corporal Painter demanded that the suspect drop the hatchet, the suspect responded by briefly raising the hatchet, shuffling his feet, and demanding Corporal Painter "come get it." In light of everything that had already transpired, this constituted a direct threat to the officers and demonstrated an escalation in the suspect's behavior. *Caraway*, 111 F.4th at 382 ("Pointing, aiming, or firing a weapon, for example, are all sufficient—*but not necessary*—movements to constitute such a threat.") (internal quotations omitted) (emphasis added).

This Court has found the presence of immediate danger in circumstances far less threatening than those here. Many deadly force cases involve a question of whether the suspect even possessed a weapon at all. This Court has held that a reasonable belief that a suspect *might* have a weapon can justify the use of deadly force. *Caraway v. City of Pineville*, 111 F.4th 369, 382 (4th Cir. 2024) ("[W]e have concluded 'several' times that 'a police officer was entitled to qualified immunity after shooting an individual whom the officer mistakenly believed to be armed.") (quoting *Cooper*, 735 F.3d at 159). In *Slattery v. Rizzo*, this Court held that the use of deadly force was justified in a case where an officer fired at a passenger in a vehicle whose hand "appeared to be partially closed around an object." 939 F.2d 213, 215 (4th Cir. 1991). The individual in *Slattery* refused the officer's commands to raise his hands, and, despite not being able to see the individual's hand (which held only a beer bottle), the officer could have reasonably believed that it held a

weapon and that a threat existed justifying the use of deadly force. *Id.* at 216.

In *Anderson v. Russell*, this Court held that the act of *reaching* for an apparent (but non-existent) weapon constituted a threatening movement. 247 F.3d 125, 131 (4th Cir. 2001) (stating that "because [the officer] had sound reason to believe that [the suspect] was armed, [the officer] acted reasonably by firing on [the suspect]" right after the suspect lowered his arms toward the bulge in his pocket rather than raising his hands as he had been ordered to do); *see also Stanton*, 25 F.4th at 234-35 ("[A]n officer need not see the weapon in a suspect's hands to find him objectively dangerous.").

In *Slattery* and *Anderson*, which were both cited approvingly by this Court in *Caraway* last year, it was important to the Court that the suspect did not comply with commands prior to the officer's decision to use deadly force. 111 F.4th at 383. Here, there is no question that the suspect possessed a deadly weapon throughout the encounter, disregarded numerous clear commands to drop the weapon, made at least two threatening gestures with a hatchet, and then verbally challenged the officers regarding the weapon. The fact that Corporal Painter had a clear view of the danger that existed does not create a heightened requirement for establishing an immediate threat. When the suspect raised the hatchet at Corporal Painter and then challenged the officers to "come get" the weapon, a reasonable officer could believe that the suspect was threatening them, especially in light of everything that had already

transpired.  *Caraway*, 111 F.4th at 382 ("[T]he relevant inquiry here is not whether [the suspect] threatened the officers, but whether there was an objective basis for the officers to believe that he presented a threat.").  Officers are not required to wait until *injury itself* is imminent, only until there is an imminent *threat* of serious injury.

In the midst of this tense and uncertain encounter, it was reasonable for Corporal Painter to believe that the suspect had "not 'obey[ed] commands' and instead "ma[de] some sort of furtive or other threatening movement with the weapon," thus "signal[ing] to the officer that the suspect intend[ed] to use [the weapon] in a way that imminently threatens the safety of the officer or another person."  *Franklin v. City of Charlotte*, 64 F.4th 519, 531 (4th Cir. 2023) (quoting *Knibbs v. Momphard*, 30 F.4th 200, 225 (4th Cir. 2022)).

The fact that the suspect was walking backwards, away from the officers, does not change the conclusion that he presented an immediate, objective threat.  For one thing, it is reasonable for an officer to consider that an individual who is slowly and methodically walking backwards would be able to immediately change direction.  The suspect here could have—in an instant—begun charging at the officers or taken off running in any direction.  There is no guarantee that an officer would be able to stop the threat of a suspect charging at him from a short distance with a heavy bladed weapon, even if he had time to process what was occurring and then accurately discharge his firearm before being struck by the blade.  This is clear from the fact

that, here, the suspect ran for approximately five seconds with the hatchet still in hand after Corporal Painter fired his weapon. Had the suspect taken off toward the officers, it is likely he would have reached them before Corporal Painter or the Female Officer could have stopped the threat. *See Sigman*, 161 F.3d at 788 ("[S]tudies [ ] have shown that an assailant with an edged weapon within 21 feet of an armed police officer can kill the officer before the officer can get off a disabling shot.").

Additionally, while the suspect was walking backwards and away from the officers, he was moving *towards* the neighboring homes, passing vehicles, and the intersection. The suspect's attempt to create distance between himself and the officers increased the severity of the threat to the surrounding community. *See Taylor v. Baltimore County*, 2025 WL 385774 at *8 (D. Md. Feb. 3, 2025) (finding it reasonable for officers to believe that suspect "posed a threat to the civilians inside their vehicles while he remained armed with the box cutter" and backing away from the officers). Requiring an officer to weigh the competing threats to themselves and nearby citizens in this manner while confronting an armed criminal suspect who is refusing commands, making threatening actions with the deadly weapon, and verbally challenging the officers asks too much as a matter of law. *See Graham*, 490 U.S. at 396-97 (reasonableness test must "allow[] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense,

uncertain, and rapidly evolving . . . .").

In sum, with only two officers on scene and having already attempted to address the threat with commands, display of weapons, and the use of a Taser, it was reasonable for Corporal Painter to believe that the suspect posed an immediate threat to the officers and those nearby. In the seconds before firing, the severity of the threat had only escalated as the suspect raised the hatchet and verbally challenged the officers. The second *Graham* factor, which this Court has recognized as "particularly important" in a deadly force analysis, weighs heavily in favor of Corporal Painter. *Caraway*, 111 F.4th at 382.

> 3. *The suspect was attempting to resist arrest and evade arrest by flight.*

As explained above, Corporal Painter was responding to 911 calls reporting two attempted breaking-and-enterings, vandalism to a residence, and an in-progress breaking and entering. JA61-62 at ¶ 52. The officers had the statutory right to detain the suspect while they investigated the several potential felonies and misdemeanors. *See* Va. Code § 18.2-92; Va. Code § 19.2-81. However, from the time the officers arrived on scene, the suspect resisted detention and attempted to evade arrest.

After initially walking towards Corporal Painter, the suspect changed direction and began walking backwards and away from the officers down the street. He ignored the more than fifteen commands Corporal Painter and the Female Officer gave to drop the hatchet. *See Rambert*, 107 F.4th at 400 ("Rambert was actively

resisting arrest or attempting to evade arrest . . . . He ignored eight commands to get on the ground[.]") (citation omitted). The suspect still did not drop the deadly weapon even after the Female Officer deployed her Taser. And, after Corporal Painter used deadly force, the suspect turned, raising the blade of the hatchet to shoulder level, and began running down the road in the direction of neighborhood homes and traffic. A reasonable officer would perceive these actions as those of a felon actively resisting arrest or attempting to evade arrest by flight. *See Garner*, 471 U.S. at 11. Therefore, the third *Graham* factor also weighs in favor of Corporal Painter.[5]

In conclusion, the material facts in the Amended Complaint and the Exhibits demonstrate that Corporal Painter is entitled to qualified immunity under the first prong of *Saucier* because the use of deadly force was objectively reasonable and did not violate the decedent's Fourth Amendment rights. 533 U.S. at 201. At the time Corporal Painter used deadly force, he was faced with a suspect who (1) had attempted to break into two homes with families inside; (2) entered one attached garage and emerged holding a deadly weapon while two of the residents of the home were outside in their yard; (3) raised the hatchet at Corporal Painter as he stepped out of his vehicle; (4) challenged the size of Corporal Painter's weapon; (5) refused

---

[5] The district court noted the suspect's flight, but apparently construed it as a factor counseling *against* the use of force. JA146.

to comply with more than fifteen commands to drop his hatchet; (6) maintained a consistently aggressive posture; (6) refused to comply even after the use of a Taser; and (7) in the seconds before Corporal Painter fired his weapon, raised the hatchet up and forwards a second time, and then lowered it while he challenged the officers to "come get it."

Considering the totality of these circumstances, which the district court consciously excluded from its analysis, there was an objectively reasonable basis for Corporal Painter to believe that the suspect presented an immediate threat of serious injury or death to Corporal Painter and the Female Officer, to the neighbors outside, to the neighbors in the homes nearby, and to those driving through the intersection directly behind the suspect. Corporal Painter is entitled to qualified immunity because his use of deadly force did not violate the Fourth Amendment.

C.    <u>No Binding Precedent Has Held that the Use of Deadly Force in Sufficiently Similar Circumstances Constitutes an Unreasonable Use of Force.</u>

For a right to be clearly established, it must be settled law; that is, it must be dictated by controlling authority or a robust consensus of cases of persuasive authority. *Ashcroft*, 563 U.S. at 741-42; *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he was doing violates that right.'" *Mullenix*

*v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (internal citations and quotation marks omitted) (quoting *Reichle v. Howards*, 566 U.S. 658, 663 (2012)).

The Supreme Court "has repeatedly told courts . . . not to define clearly established law at a high level of generality." *City of Escondido, Cal. v. Emmons*, 586 U.S. 38, 42 (2019) (quoting *Kisela*, 584 U.S. at 103-104); *White v. Pauly*, 580 U.S. 73, 79, (2017). The Supreme Court has explained that:

> Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue . . . .

*City of Escondido, Cal.*, 586 U.S. at 42.

At the time of the events in question, the state of the law did not provide Corporal Painter with "fair warning" that his conduct in response to a criminal suspect wielding a hatchet would violate a constitutional right. There is no binding caselaw that fairly advises officers that they cannot use deadly force in the face of an immediate threat posed by a felony suspect armed with a large, bladed weapon who disregards numerous commands and raises and lowers the weapon while verbally challenging the police.

Rather, existing caselaw supports the objective reasonableness of Corporal Painter's actions and demonstrates that he did not violate clearly established law.

For example, in *Kisela*, the United States Supreme Court reversed the Ninth Circuit and held that officers were entitled to qualified immunity for their use of force when they shot a woman was wielding a knife. There, the officer was confronted with a female suspect "who had just been seen hacking a tree with a large kitchen knife and whose behavior was erratic enough to cause a concerned bystander to call 911." *Kisela*, 584 U.S. at 105. No crime had reportedly been committed by the suspect. *Id.* at 101-02. The officers observed the woman exit her home and move toward a civilian, but she had stopped by the time the officers fired. *Id.* at 101. The woman "appeared calm" during the encounter but did not acknowledge the officers' presence or drop the knife. *Id.* at 101-02. She did not make any sort of threatening gesture with the knife, such as raise it up, before the officers fired. *Id.* However, based on the woman's proximity to a civilian, her reported erratic behavior, and her disregard of two verbal commands, the officers did not violate clearly established law when they used deadly force. *Id.* The Supreme Court concluded that it was "far from an obvious case in which any competent officer would have known that shooting [the suspect] to protect [the bystander] would violate the Fourth Amendment." *Id.* at 105-106.

In its opinion in *Kisela*, the U.S. Supreme Court cited and discussed with approval the decision of the Ninth Circuit in *Blanford*, where the Court of Appeals

affirmed a grant of qualified immunity based on the objective reasonableness of the use of deadly force:

> In *Blanford,* the police responded to a report that a man was walking through a residential neighborhood carrying a sword and acting in an erratic manner. There, as here, the police shot the man after he refused their commands to drop his weapon . . . . There, as here, the police believed (perhaps mistakenly), that the man posed an immediate threat to others. There, the Court of Appeals determined that the use of deadly force did not violate the Fourth Amendment. Based on that decision, a reasonable officer could have believed the same thing was true in the instant case.

*Kisela*, 584 U.S. at 106 (internal citations omitted).

In *Blanford*, similar to the case at hand, the individual did not heed the officers' commands to "drop the sword." 406 F.3d at 1112. The officers, with their guns drawn and aimed, followed behind the individual at a distance of approximately 20 to 25 feet since he was holding an edged weapon. *Id*. The deputies continued to give commands, yet the individual stopped, raised the sword, and made a loud growling or roaring sound and then lowered the sword. *Id*. at 1112-1113. He turned onto another street and began heading towards a residence. The officers believed they "had to secure the weapon before doing anything else in order to protect the public." *Id.* at 1113. The officers fired three volleys, with approximately 14 seconds passing between the first and last shots. *Id.* at 1114. The entire encounter lasted about two minutes. *Id.*

In *Blanford*, unlike in the case at hand, the police officers were not responding to any reported crimes. 406 F.3d at 1112. Also unlike this case, in *Blanford* the individual did not actually hear and ignore the officers' initial commands because he was wearing headphones. *Id.* However, under those facts and circumstances, the Ninth Circuit affirmed the award of qualified immunity because it was objectively reasonable for an officer on scene to perceive the individual with the sword to be an immediate danger to others.

In *Sigman*, this Court affirmed a grant of qualified immunity where officers responded to a 911 call in connection with a domestic dispute. 161 F.3d at 784-785. The suspect was inside the house, had a knife, had cut himself, and was drunk. *Id.* at 785, 787. He was yelling from inside the house at the officers who were outside. *Id.* at 785. The officers attempted to use pepper spray through the window of the home. *Id.* During the standoff, the officers asked the suspect to come out and he replied with "if you want me, come in and get me." *Id.* at 785. A crowd had gathered along the street behind the officers. *Id.* The suspect stepped out of the house and "all of the officers at the scene perceived that [the suspect] was holding a knife." *Id.* at 787. "Although they gave [] warnings [to drop the knife and stop approaching] several times, [the suspect] ignored them, making statements such as, "Go ahead and shoot me" and "I want to die." *Id.* at 785. Even though the suspect's comments and actions largely indicated an intent to self-harm with the knife, this Court,

considering the totality of the facts and circumstances set forth above, stated that "[f]aced with this tense and dangerous situation, we conclude that [the officer] reasonably perceived a threat to his safety and the safety of others and that his response therefore was objectively justified." *Id*. at 787; *see also Taylor*, 2025 WL 385774 at n.9 ("existing precedent does not place beyond debate" whether it was unreasonable to use deadly force in response to a suspect walking backwards towards an intersection while carrying a box cutter).

These cases and those cited above in Corporal Painter's analysis of the *Graham* factors stand in contrast to decisions finding that the use of deadly force on an armed individual was objectively *un*reasonable. In *Franklin*, officers responded to a call about a man brandishing a gun at a restaurant. 64 F.4th at 525. Before they arrived, the officers were advised that a restaurant employee had been "calming [the suspect] down" and "pray[ing] with him." *Id.* at 526 n.1. When the officers arrived, the suspect was crouching near the employee and the gun was out of sight. *Id.* at 526. The officers gave a series of inconsistent commands ordering the suspect to show his hands and drop the gun. *Id.* at 533, 535. Because the gun was in the suspect's jacket, it was impossible for the suspect to follow both sets of commands. The Court also remarked that the volume and frequency of the commands—a "torrent of shouting and gun-pointing"—rendered it impossible to even hear whether the suspect was responding. *Id.* at 533. The officers' commands "simply were too

ambiguous to transform [the suspect's] hesitation into recalcitrance." *Id.* When the suspect attempted to comply with the commands by slowly removing the handgun from his jacket, he "held [the gun] by the top of the barrel slide with the grip-side closest to the officers and the muzzle pointed away from them." *Id.* at 526. One officer promptly shot the suspect and killed him. *Id.* The Court reversed the grant of qualified immunity based on the inconsistent commands and the nonthreatening way the suspect was holding the weapon.

In *Cooper*, officers responded to a mobile home for a report of domestic disturbance. 735 F.3d at 155. The officers tapped on the window of the home but never announced their presence as law enforcement, even when the victim called out for anyone in the yard to identify themselves. *Id.* The victim exited his home carrying a shotgun with the muzzle pointed down to "investigat[e] a nocturnal disturbance on his own property." *Id.* at 160. As he stepped onto the porch of his own home, the officers immediately fired their weapons without giving any commands for the individual to drop the gun. *Id.* at 155-56. This Court found that "no reasonable officer could have believed that [the victim] was aware that two sheriff deputies were outside," but expressly noted that had the officers identified themselves, "they might have been safe in the assumption that a man who greets law enforcement with a firearm is likely to pose a deadly threat." *Id.* at 159-60.

Similarly, in *Hensley*, the victim was shot in the front yard of his house while holding a firearm that was pointed at the ground. 876 F.3d at 578. This Court noted that the officers "concede[d] that neither of them ever spoke to" the victim, never announced their presence, and "never ordered [him] to stop, to drop the gun or issued any type of warning." *Id.*

In *Aleman*, police responded to a call from a man exhibiting signs of paranoia who claimed that he wanted to turn himself in to the police. 80 F.4th at 271. There was no active crime reported. *Id.* When the officers arrived, they found the man standing in the doorway of his home. *Id.* at 273. The officers instructed him to raise his hands, which he did. *Id.* at 273-74. Although he was holding a firearm in one hand, at the moment he was shot he was "standing still with both his arms frozen in place and both his hands in the air, in a universally recognized position of surrender." *Id.* at 274.

Finally, in *Betton v. Belue*, while executing a search warrant of the victim's home, plain-clothed officers shot an armed individual without ever identifying themselves as law enforcement or issuing any commands to the victim. 942 F.3d 184, 188, 193 (4th Cir. 2019). This Court stated that, "like the citizen in *Cooper*, [the victim] could not have known that members of law enforcement caused the noise that he heard on his property, because the officers had failed to announce their presence at any time before firing their weapons. And as in *Cooper*, [none of the]

officers on the scene issued any commands after entering [the victim's] residence and observing him holding a gun at his side." *Id.* at 193. The Court then stated that

> If [the officers] had identified themselves as members of law enforcement, [they] reasonably may have believed that [the victim's] presence while holding a firearm posed a deadly threat to the officers. And had [the victim] disobeyed a command given by the officers, such as to drop his weapon or to "come out" with his hands raised, [the officer] reasonably may have feared for his safety upon observing [the victim] holding a gun at his side.

*Id.*

The facts of this case are not similar to any of this Court's precedents holding that officers unreasonably shot an armed individual. Unlike all but one of the above cases (*Franklin*), the incident here occurred in a public place and not on the suspect's property, where Fourth Amendment rights are highest. The nature of the reported crimes and the presence of other citizens nearby created an additional threat not present in most of the above cases. Further, Corporal Painter and the Female Officer were clearly recognizable as law enforcement and issued numerous, clear, and unambiguous commands to the suspect to drop his deadly weapon. The commands were given with a professional, controlled delivery and directed the suspect to do one thing—drop his hatchet. Moreover, the suspect raised the hatchet in a threatening manner (the second time he had done so) just seconds before Corporal Painter fired. The suspect then verbally challenged the officers to "come get" the

weapon. Each of these facts is significantly distinct from the above cases finding deadly force to have been unreasonable.

In *City of Tahlequah v. Bond*, the Supreme Court reiterated that "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law" and noted that it has "repeatedly told courts not to define clearly established law at too high a level of generality. It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." 595 U.S. 9, 12 (2021) (citations and internal quotation marks omitted). Neither the Supreme Court nor this Court has ever issued an opinion addressing circumstances sufficiently similar to those present here. Accordingly, Corporal Painter is entitled to qualified immunity as a matter of law.

## CONCLUSION

For the reasons stated above, Corporal Painter respectfully requests that the Court reverse the decision of the district court and find he is entitled to qualified immunity as to Count III of the Amended Complaint.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Rule 34 and Local Rule 34(a), Corporal Painter requests oral argument in support of his appeal in order to address any questions or concerns about

the facts, his argument as to the application of the law to the facts, or to otherwise assist in the decisional process.

Respectfully Submitted,


*/s/ Julie A. C. Seyfarth*
COUNTY ATTORNEY'S OFFICE,
   CHESTERFIELD COUNTY
Jeffrey L. Mincks
Julie A. C. Seyfarth
Andrew J. Fulwider
9901 Lori Road
Chesterfield, Virginia 23832
(804) 748-1000
seyfarthj@chesterfield.gov

*Attorney for Defendant-Appellant*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No.  25-1058    **Caption:** MARGARET P. BYERS v GORDON J. PAINTER

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

> **Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type.  See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

> **Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words.  Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2) & 40(d)(3).

> **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger.  A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓] this brief or other document contains ___10,278___ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✓] this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word 2016_____ [*identify word processing program*] in
14 point Times New Roman_____ [*identify font size and type style*]; **or**

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) Julie  A.  Seyfarth_____

Party Name Appellant_____

Dated: 3/12/2025_____